# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| TIMOTHY E. ELDER, DDS, individually and on behalf of all others similarly situated, | ) ) ) ) | Civil Action No. |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Jury Trial Demanded |
| ASPEN AMERICAN INSURANCE COMPANY, | ) ) ) ) | |
| Defendant. | ) ) | March 29, 2021 |

## CLASS ACTION COMPLAINT

Plaintiff Timothy E. Elder, DDS, ("Plaintiff") on behalf of himself and all others similarly situated (collectively, "Class Members"), files this complaint against Defendant Aspen American Insurance Company  ("Defendant" or "Aspen") alleging as follows:

## I.  NATURE OF THIS ACTION

**1.**  This lawsuit is a class action for declaratory and injunctive relief and breach of contract on behalf of purchasers of Aspen's insurance policy written on coverage form ASPDTPR001 (09/17)—or any other Aspen coverage form with the same operative language. Plaintiff filed this case to ensure that he and the Class Members receive urgently needed insurance benefits for which they paid substantial sums in premium payments.

**2.**  Plaintiff bought an Aspen insurance policy to protect his livelihood if he were required to suspend operations of his business for reasons outside his control or to

prevent further property damage. Plaintiff had one such Aspen policy in effect between August 1, 2019, through August 1, 2020.

3.  The policy purchased by Plaintiff is a standard-form contract. It is not bespoke.

4.  Plaintiff paid all premiums when they were due.

5.  On information and belief, Defendant issued materially identical policies to other policyholders during the relevant period.

6.  For at least the past fifteen years, most commercial property policies have included an industry-standard provision, drafted by the Insurance Services Office (the ISO), an advisory organization that provides policy language and coverage forms to insurers and reinsurers. That provision excludes coverage "for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease."[1] By contrast, the agreements purchased by Plaintiff and, on information and belief, Class Members, do *not* contain any such exclusion.

7.  Although the risk of a virus or pandemic like COVID-19 was or should have been foreseeable to Aspen, Aspen chose *not* to include a virus or pandemic exclusion in its policies.

8.  In the face of the COVID-19 pandemic, the conspicuous omission of a virus or pandemic exclusion from Aspen's policies is particularly significant.

---

[1] A copy of that standard-form exclusion (Commercial Property endorsement No. CP 01 40 07 06), and the ISO's 2006 submission to state regulators introducing it, is attached as Exhibit 1 to this complaint.

**9.**  Plaintiff and Class Members have been forced to reduce or halt their business operations because of COVID-19. The virus, which is airborne, contaminating spaces, and also attaching to surfaces and objects, has made their business premises unsafe and unusable for normal business.

**10.**  Moreover, state and local government bodies have issued mandatory orders severely restricting or prohibiting access to Plaintiff's and Class Members' business premises because the damage COVID-19 caused to business properties open to the public cannot be sufficiently abated by regular cleaning or disinfecting. Plaintiff and Class Members have been forced, by the virus and by civil authorities, to suspend, interrupt, or curtail their operations.

**11.**  As a result of COVID-19 and orders by civil authorities, Plaintiff and Class Members sustained substantial losses. Seeking indemnity for those losses, they have tendered claims for coverage under the policies they purchased from Aspen.

**12.**  Aspen denied Plaintiff's and Class Members' claims despite Aspen's policies' omission of a virus or pandemic exclusion. Indeed, Aspen has taken a firm position that the policy purchased by Plaintiff (including Aspen's Business Interruption Coverage Form), and on information and belief by other Class Members, does not provide coverage for COVID-19-related property losses. It has denied Plaintiff's requests for coverage and, on information and belief, all Class Members' claims, on identical grounds, without conducting any individualized investigation.

**13.**  There are, therefore, controversies between Plaintiff and Class Members, on the one hand, and Aspen on the other, as to their respective rights, duties, and obligations

under the coverage provisions contained in Aspen's policies. This lawsuit seeks a class-wide adjudication of these controversies—including a declaration of Aspen's obligations and policyholders' rights concerning COVID-19-related claims tendered under its Business Interruption Coverage Form, an injunction enforcing Aspen's coverage obligations under its Business Interruption Coverage Form, and contract damages for Aspen's breach of its coverage obligations under its Business Interruption Coverage Form.

## II. PARTIES

14.  Plaintiff Dr. Timothy Elder owns and operates a dental practice located at 1712 Eye St., NW, #306, Washington, DC. Dr. Elder is the named insured on a standard-form commercial property policy issued by Aspen, Policy No. D016948-07, covering the period August 1, 2019, to August 1, 2020. That policy includes Aspen's Business Interruption Coverage Form. The prevalence of COVID-19 and orders by civil authorities have forced Plaintiff to reduce his operations drastically.

15.  Defendant Aspen American Insurance Company is an insurance carrier incorporated and domiciled in Texas, with its principal place of business at 175 Capital Blvd, Ste 300, Rocky Hill, Connecticut. Defendant Aspen is authorized to write, sell, and issue business insurance policies in all 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands. Defendant conducts business within these places by selling and issuing business insurance policies to policyholders, including Plaintiff and other members of the proposed class.

### III. JURISIDICTION AND VENUE

**16.** The Court has jurisdiction over Plaintiff's claims under 28 U.S.C. 1332(d)(2) because: (a) this action is brought as a proposed class action under Fed. R. Civ. P. 23, (b) at least one member of the class is a citizen of a state different from the Defendant, (c) the amount in controversy exceeds $5 million, exclusive of interest and costs, (d) the proposed class contains more than 100 members, and (e) no relevant exceptions apply.

**17.** This Court can exercise personal jurisdiction over Aspen because it (a) is headquartered in Connecticut, (b) transacts business in Connecticut including insuring property and risks located in Connecticut, and (c) continues to seek additional business in Connecticut.

**18.** Venue is proper in this District under 28 U.S.C. § 1391 because a substantial portion of the acts and conduct giving rise to the claims occurred in and/or emanated from this District. In addition to being headquartered in Connecticut, Aspen developed, marketed, and sold its insurance products in Connecticut. On information and belief, Aspen wrongfully denied insurance coverage for COVID-19-related losses incurred by Class Members residing in Connecticut.

### IV. FACTUAL ALLEGATIONS

### COVID-19

**19.** COVID-19—more formally known as Severe Acute Respiratory Syndrome Coronavirus 2 (or SARS-CoV-2)—is a physical pathogen. It spreads among humans both through respiratory droplets and aerosols (when people talk, cough, or sneeze) and—

when those droplets land on objects and surfaces—by contact with those objects or surfaces.[2]

**20.**     A growing body of evidence suggests that the virus transmits both through droplets when someone sneezes and coughs and aerosols produced by normal breathing. Aerosols are particularly concerning because, unlike droplets, which may be suspended for only a few seconds, aerosols can remain suspended in the air for hours until gravity ultimately forces their descent onto a surface. Consequently, aerosols can spread widely through airflow and even settle on surfaces hundreds of feet away from an infected individual. Thus, someone not even in the vicinity of an infected person can unknowingly become infected, including through contact with an infected surface.

**21.**     According to several studies, COVID-19 can survive for days on objects and surfaces. Indeed, the CDC has reported that the virus was still detectable on various surfaces on a cruise ship, inside the cabins of both symptomatic and asymptomatic infected passengers, 17 days after the cabins had been vacated.[3]

**22.**     Given COVID-19's impact on property, the federal Center for Disease Control (CDC), issued guidance emphasizing the spread of the virus through surface transmission and advising that "surfaces and objects in public places" therefore "should be cleaned and disinfected before each use."[4]

---

[2] https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html.

[3] https://www.cdc.gov/mmwr/volumes/69/wr/mm6912e3.htm?s_cid=mm6912e3_w.

[4] https://www.cdc.gov/coronavirus/2019-ncov/community/disinfecting-building-facility.html.

**Civil Authorities' Response to the Property Harms Caused by COVID-19**

**23.** Consistent with the CDC's findings and guidance, state or local government officials in every state in the Union have issued emergency declarations relating to COVID-19.

**24.** These governmental orders typically required the total shutdown of "nonessential" businesses and stringent social distancing requirements, among other things. Although essential businesses, including dental offices in the District of Columbia, were allowed to remain at least nominally open, they were required to curtail in-person services significantly to comply with the orders. For example, they, including Plaintiff, have had to increase the frequency of cleaning, reduce hours, install new protective barriers between employee and customer, establish new procedures to ensure the protection of their workforce and consumers, and provide personal protective equipment to their workforce and consumers. In addition, many such businesses have had great difficulty retaining employees who fear becoming infected at work. Coupled with social distancing restrictions applicable to public or ride-sharing transport, Plaintiff's dental practice and other essential businesses were functionally closed.

**25.** The District of Columbia (Plaintiff's locale) declared the COVID-19 pandemic a public health emergency in early March 2020. On March 24, 2020, the District of Columbia issued an order closing non-essential businesses. *See* Mayor's Order 2020-045; 2020-046; 202-053. Recognizing COVID-19's impact on property, the closure order instructs District of Columbia residents to "[wash] hands with soap and water for at least twenty (20) seconds or using hand sanitizer frequently, or after contact with potentially-infected

surfaces, to the greatest extent feasible," and also to "[r]egularly clean] high-touch surfaces." Mayor's Order 2020-053 at 8. In addition, essential businesses, including Plaintiff's dental office, were ordered under the threat of civil, criminal, and administrative penalties including civil fines, summary suspension or revocation of licensure:

> To the greatest extent feasible, comply with Social Distancing Requirements as defined in section IV.5 of this Order, including by separating staff by off-setting shift hours or days and maintaining a separation of at least six (6) feet among and between employees and members of the public, including when any customers, clients, or patients are standing in line or sitting in a waiting room, to the maximum extent possible, separating shifts. . . .

26. A week later, the District of Columbia issued a stay-at-home order that, among other things, ordered District of Columbia residents to:

> not linger in common areas of apartment buildings and shall not use buildings' facilities, such as gyms, party rooms, lounges, rooftop, or courtyard spaces. Such spaces are unlikely to be disinfected often and could otherwise expose individuals to the COVID-19 virus. . . . (a) Individuals using public transportation to engage in Essential Travel must comply with the Social Distancing Requirement . . . (b) "Drivers of ride-sharing vehicles engaged in Essential Travel must have disinfecting wipes in their vehicles and must wipe down all surfaces potentially touched by a passenger after each ride."(c) "Individuals using shared personal mobility devices such as scooters and bicycles are strongly encouraged to bring their own disinfecting wipes and wipe down the part of the device they touch before and after riding." (d) "Public and private transit officials shall make provisions for frequently disinfecting buses, subway cars, and any other vehicles they operate, to the highest feasible standards.

Mayor's Order 2020-054 at 3. To this day, Plaintiff's business and other essential businesses in the District of Columbia remain severely impacted because of these and subsequent orders.

**27.** Like in the District of Columbia, civil authorities nationwide have issued COVID-19 orders that recognize COVID-19's impact on property and, that both legally and as a practical matter, cause a significant suspension of essential business operations. *E.g.*, Colorado Dep't of Pub. Health & Env't, Updated Public Health Order No. 20-24, at 1 (Mar. 26, 2020) (emphasizing the danger of "property loss, contamination, and damage" due to COVID-19's "propensity to attach to surfaces for prolonged periods of time" and therefore requiring a stay-at-home order)[5]; N.Y.C. Emergency Exec. Order No. 100, at 2 (Mar. 16, 2020)2 (emphasizing the virulence of COVID-19 and that it "physically is causing property loss and damage")[6]; N.Y.C. Emergency Exec. Order No. 103 at 1 (March 25, 2020) (recognizing the "actions taken to prevent such spread [of COVID-19] have led to property loss and damage")[7].

**28.** As the CDC's and state and local officials' statements indicate, civil authorities have consistently emphasized COVID-19's direct physical impact on property and the role that surface transmission plays in spreading the virus.

**The Insurance Industry's Response to the Property Harms Caused by COVID 19**

**29.** In 2006, the ISO filed its standard-form virus exclusion with state insurance regulators accompanied by an explanatory statement expressly acknowledging the impact of disease-causing agents, like COVID-19, on property:

---

[5] https://www.pueblo.us/DocumentCenter/View/26395/Updated-Public-Health-Order---032620.

[6] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-100.pdf.

[7] https://www1.nyc.gov/assets/home/downloads/pdf/executive-orders/2020/eeo-103.pdf.

> Disease causing agents may . . . enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.

Exhibit 1.

**30.**   However, amid the current pandemic, facing proliferating and sizeable claims, the insurance industry is chiefly concerned with limiting claims. For example, in a widely publicized letter to members of Congress, on April 2, 2020, senior executives of four leading insurance industry trade organizations launched a campaign to restrict coverage. "Standard commercial policies offer coverage and protection against a wide range of risks and threats and are vetted and approved by state regulators. Insurance coverage works by spreading risk, *but* that model cannot account for a situation in which losses are catastrophic and nearly universal." Exhibit 2 (emphasis added). In the face of mounting property claims, these executives announced, preemptively, that their policies do not cover pandemic-related losses: "Standard business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19, and as such, were not actuarially priced to do so." *Id.*

**Coverage for COVID-19 Related Losses Under Aspen's Commercial Property Policies**

**31.**   Over the years, the insurance industry has developed specialty products for commercial policies that include an express and specific grant of coverage for lost profits and other economic losses sustained when a business must either shut down or curtail its operations, including due to a pandemic ("business interruption coverage").

**32.** Aspen designed a multi-part liability and property insurance policy for dental practices that includes business interruption coverage, which is provided for by Business Interruption Coverage Form, ASPDTPR001.

**33.** As a result of Covid-19 and government shutdown orders, Plaintiff has lost income in a manner covered under the following provisions of Aspen's Business Interruption Coverage Form:

### I. COVERAGE AGREEMENTS

### A. Covered Property

We will pay for all direct physical **damage** to covered property at the premises described on the Declarations caused by or resulting from any **covered cause of loss.**

Covered property means the following types of property for which a limit of insurance is shown on the Declarations or which is shown below:

1. **Building;**

2. **Your blanket dental practice personal property;**

. . .

3. **Practice Income**

We will pay for the actual loss of **practice income you** sustain . . . due to the necessary suspension of **your** practice during the **period of restoration**. The suspension must be caused by direct physical **damage** to the **building** or **blanket dental practice personal property** at the described premises caused by or resulting from a **covered cause of loss**. . .

We will only pay for **loss of practice income** that occurs within 12 consecutive months after the date of direct **physical damage** . . .

. . .

11

4.  **Extra Expense**

Extra expense means the extra expenses necessarily incurred by **you** during the **period of restoration** to continue normal services and operations which are interrupted due to **damage** by a **covered cause of loss** to the premises described . . .

We will only pay for extra expenses that you incur within 12 consecutive months after the date of direct physical **damage**. . .

. . .

B.  **Covered Related Expenses**

. . .

13.  **As respects practice income**:

. . .

b. Civil Authority

We will pay for the actual loss or **practice income** and **rents you** sustain caused by action of civil authority that prohibits access to the described premises due to the direct physical **damage** to property, other that the described premises, caused by or resulting from any **covered cause of loss**.

IV. DEFINITIONS

. . .

"**Damage**" means partial or total loss of or damage to your covered property.

. . .

**34.**  Specifically, in the "Practice Income" provision, Aspen agreed to pay for Plaintiff's loss of practice income sustained due to the "necessary suspension of practice during the "period of restoration" caused by "direct physical damage" (subject to a "Valued Daily

Limit"). Aspen agreed to "pay for loss of practice income that occurs within 12 consecutive months after the date of direct physical damage."

35.   Aspen also agreed to pay necessary "Extra Expenses" that Plaintiff incurred during the "period of restoration" "due to damage by a covered cause of loss" to the covered property. "Extra Expenses" means expenses necessarily incurred by Plaintiff "during the period of restoration to continue normal services and operations."

36.   In the "Civil Authority" provision, Aspen agreed to pay "the actual loss of practice income" that Plaintiff sustains "caused by action of civil authority that prohibits access to" the covered property "due to the direct physical damage to property," other than at the covered property, "caused by or resulting from any covered cause of loss."

37.   Under Aspen's Business Interruption Coverage Form, "direct physical **damage**" is a necessary condition to trigger the coverages mentioned above, assuming other relevant conditions are satisfied. (Emphasis in the original.)

38.   The policy does not define the combined three-word phrase "direct physical **damage**." Instead, it clarifies only the word "**damage**" by defining it as a "partial or total loss of or damage to [ ] property."

39.   When analyzing if an event triggered the Business Interruption Form's coverages, "direct physical **damage**" is shorthand for the phrase "direct physical [partial or total] loss of or damage to" property.

40.   Courts have given the phrase "direct physical loss of or damage to" property varying and conflicting interpretations. Thus, for example, courts have variously and

contradictorily applied the phrase to both require and deny coverage for business income losses due to odors, asbestos, lead, mold, and the loss of electronic data.

**41.** In construing the phrase "direct physical loss of or damage to" property, some courts have conditioned coverage on proof of demonstrable structural damage or other physical alteration to the property. Different courts have construed the same phrase to require coverage for the lost or reduced use or functionality of an insured property even without any demonstrable structural change or other physical alteration.

**42.** As applied to the coronavirus and that virus's impacts on surfaces and objects, the phrase "direct physical loss of or damage to" property in Aspen's commercial property policies is ambiguous—at best. The combination of several factors underscores its ambiguity:

    a. The absence of any definition of the phrase anywhere in Aspen's commercial property policies;

    b. The longstanding disagreements among courts about the meaning of the phrase—including disputes about whether "loss" differs from "damage," whether one or both of those terms are modified by "physical," and whether the loss of a property's use, functionality, or reliability constitutes "direct physical loss of or damage to" or whether, more narrowly, evidence of a demonstrable physical alteration of the property should be required;

    c. The apparent ease with which Aspen could have drafted its policy language to plainly express an intention to exclude coverage for viruses (or other

14

pandemics) by, for example, merely adopting the ISO-standardized exclusion for viruses; ambiguity, here, was eminently avoidable;

d.  The consistent and reasonable understanding of civil authorities, reflected in their official public statements (illustrative examples of which are quoted in paragraph 27 above), regarding the virus's propensity to cause property loss or damage. Just as many civil authorities have, so, too, a reasonable policyholder could understand the physical impacts of COVID-19 on surfaces and objects as physically damaging or otherwise causing losses to property — and, therefore, would reasonably have expected coverage;

e.  The explicit admission by the American Association of Insurance Services, when the standard-form virus exclusion was introduced, in 2006, that its purpose was to "clarify" that "loss, cost, or expense caused by, resulting from, or relating to any virus, bacterium, or other microorganism that causes disease, illness, or physical distress or that is capable of causing disease, illness, or physical distress is excluded." No such "clarification" would have been needed if policies without the new language already clearly excluded coverage for viruses and pandemics.

43.  The ambiguity in the phrase "direct physical loss of or damage to" property, as applied to the coronavirus, must be construed against the drafter — and, therefore, in favor of coverage.

**Aspen's Blanket Denials of Coverage for COVID-19 Related Losses**

**44.** Plaintiff and Class Members purchased from Aspen an "all risk" commercial property policies.

**45.** "All risk" property coverage does not literally provide coverage against "all" risks. But it also does not provide coverage merely for losses from designated causes or specified perils. Instead, it provides coverage for any risk that the insuring contract does not exclude—or, as Aspen's standard-form policy states it, coverage is promised "except as excluded or limited [under this coverage form]."

**46.** Plaintiff paid substantial premiums in exchange for Aspen's policy and complied with the contract's applicable provisions.

**47.** On or about August 18, 2020, Plaintiff notified Aspen of his COVID-19 related business losses. Among other things, Plaintiff explained that he experienced a direct physical loss to his property because (i) COVID-19 caused him to be unable to fully "utilize his property in the real, material, or bodily world" and (ii) civil authority's stay at home orders (*see*, *e.g.*, paragraphs 27 above) (and/or COVID-19) prevented patients and suppliers from accessing his property. Exhibit 3.

**48.** On December 9, 2020, Aspen's third-party administrator, American Claims Management, denied Plaintiff's claim for coverage. In substantive part, the denial letter stated:

> Our investigation indicates that neither your building nor practice personal property sustained direct physical damage. Instead, the inability to continue your practice, in whole or part, is due to a directive or guideline from [civil authorities]. Even if there were direct physical damage, the claim would not be covered because the Policy specifically excludes damage

caused by the enforcement of any ordinance or law regulating the use of the property, loss of use or loss of market, and "microbes," which includes any "non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease." To the extent Coronavirus is a microbe, the Additional Coverage - Limited Coverage for Fungus, Wet Rot, Dry Rot and Microbes does not apply to this claim because Coronavirus did not result from any of the Specified Causes of Loss.

Exhibit 4.

49. On information and belief, Aspen has categorically denied all COVID-19-related claims tendered to it by Class Members on the same basis.

50. Aspen denied Plaintiff's claims without any inspection or review of Plaintiff's physical location. On information and belief, Aspen also denied all Class Members' claims for COVID-19-related losses without inspecting or reviewing their premises. Aspen has therefore waived any right to inspect Plaintiff's or Class Members' properties, deny coverage for any reason related to conditions at their properties, or raise any defense related to conditions or facts specific to a property.

51. Plaintiff's and Class Members' claims for coverage for COVID-19-related business losses rise from a single course of conduct by Aspen, which, unless restrained by this Court, will continue and will continue to cause both Plaintiff and all Class Members significant damage and injury.

## V. CLASS ALLEGATIONS

52. Plaintiff brings this action on behalf of himself and all others similarly situated, seeking to represent the following class:

All persons and entities that (a) have "Business Income Coverage" under an Aspen commercial property policy written on form ASPDTPR001 (01/17) or any other Aspen policy with the same operative language, (b)

17

made a claim under that policy for COVID-19-related property losses, and (c) were denied coverage for that claim.

53. Plaintiff may, in the future, expand, narrow, or otherwise modify or amend the above class definitions or propose the formation of subclasses as the result of discovery or for other reasons.

54. **Numerosity**. The exact number of Class Members is not known, but the numbers are sufficiently large that individual litigation is impracticable. The Class consists of hundreds if not thousands of members. The identity of all Class Members will be readily ascertainable in Aspen's books and records.

55. **Commonality and Predominance**. Several questions of both fact and law are common to the claims of Plaintiff and Class Members; those questions predominate over any questions that may affect only individual Class Members; and these common questions include, but are not limited to, the following:

a.  For purposes of Aspen's Business Interruption Coverage Form, is the phrase "direct physical partial or total loss or damage" ambiguous as applied to COVID-19?

b.  Does the "Practice Income" coverage in Aspen's Business Interruption Coverage Form provide coverage for COVID-19-related property losses?

c.  Does the "Extra Expenses" coverage in Aspen's Business Interruption Coverage Form provide coverage for expenses necessarily incurred to resume normal operations after experiencing COVID-19-related property losses?

    d.  Does the "Civil Authority" coverage in Aspen's Business Interruption Coverage Form provide coverage if civil authorities' COVID-19 orders required the suspension of practice?

    e.  Has Aspen breached its coverage obligations under its Business Interruption Coverage Form by denying Plaintiff's and Class Members' claims for coverage for COVID-19-related property losses?

    f.  By not inspecting their insureds' properties before denying their claims for coverage, has Aspen waived the right to inspect Plaintiff's or Class Members' properties, deny coverage for any reason related to conditions at their properties, or raise any defense related to conditions or facts specific to a property?

    g.  By denying Plaintiff's and Class Members' Claims, has Aspen breached its duty of good faith and fair dealing?

**56. Typicality**. Plaintiff's claims are typical of Class Members' claims. All of them purchased identical insurance coverage from Aspen, containing identical language regarding business income losses and contamination, Aspen denied their coverage claims, and they have sustained damages from those denials as a result.

**57. Superiority**. Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy. First, separate actions by individual Class Members would burden the courts and create risks of inconsistent or varying adjudications of common questions. Second, class proceedings will present fewer management difficulties, create economies of scale, coordinate and consolidate discovery,

and reduce the cost and duplication that will otherwise result from overlapping discovery requests, disputes, and compliance occurring in several cases and courtrooms once.

**58. Declaratory and Injunctive Relief**. Aspen has acted or refused to act on grounds generally applicable to Plaintiff and all Class Members. Final declaratory relief as to the interpretation of Aspen's Business Interruption Coverage Form, and final injunctive relief enforcing Aspen's coverage obligations, is therefore appropriate. Separate actions would create a risk of inconsistent adjudications, resulting in incompatible standards and disparate treatment of similar claims. Moreover, as a practical matter, adjudications in one case might impair or impede the ability of other insureds, not parties to this action, to protect their interests.

**59. Adequacy**. Plaintiff will fairly and adequately represent and protect the interests of the proposed class. Plaintiff has no disabling conflicts with, or interests materially adverse to, Class Members. And Plaintiff has retained qualified and experienced counsel with proven track records in class litigation and insurance coverage disputes. One of Plaintiff's counsel, Jay Angoff, served for six years as Director of the Missouri Department of Insurance. Mr. Angoff has also served as Deputy Insurance Commissioner of New Jersey.

## VI. FIRST CAUSE OF ACTION
### Declaratory Relief
#### (*By Plaintiff and the Class*)

**60.** Plaintiff repeats and re-allege paragraphs 1–59 above.

**61.**  An actual controversy exists between Plaintiff and Class Members, on the one hand, and Aspen on the other, regarding Plaintiff's and the Class's rights and Aspen's obligations under its Business Interruption Coverage Form and other Aspen policies with the same operative language for business income coverages.

**62.**  Pursuant to 28 U.S.C. § 2201, Plaintiff and the Class seek a judgment from the Court declaring that:

    a.  The language in Aspen's Business Interruption Coverage Form promising coverage for direct physical loss of or damage to covered property —and likewise the same operative language in any other Aspen policy—is ambiguous. And that ambiguity must be construed against Aspen and in favor of coverage.

    b.  COVID-19-related property losses are covered losses under Aspen's Business Interruption Coverage Form and likewise under any other Aspen commercial property policy using the same operative language.

    c.  Aspen has waived any right to inspect Plaintiff's or Class Members' business premises, deny coverage for any reason related to conditions at their business premises, or raise any defense related to conditions or facts specific to premises.

    d.  Aspen is obligated to pay Plaintiff and Class Members Business for all business income losses (up to policy limits) resulting from the interruption of their businesses due to COVID-19.

63.  Plaintiff and Class Members also seek injunctive relief, compelling Aspen to pay Plaintiff and all Business Income Coverage Class Members for all Business Income losses (up to policy limits) resulting from the interruption of their businesses due to COVID-19.

## VII. SECOND CAUSE OF ACTION
### Breach of Contract
#### (*By Plaintiff and the Class*)

64.  Plaintiff repeats and re-allege paragraphs 1–59 above.

65. Plaintiff's and Class Members' commercial policies, issued by Aspen, are contracts.

66. Pursuant to their policies with Aspen, Plaintiff and Class Members paid Aspen premiums, in exchange for Aspen's promise to indemnify Plaintiff and Class Members for covered losses.

67. Plaintiff has complied with all applicable obligations under their insurance contracts.

68. By its conduct, as alleged above, Aspen has breached its coverage obligations to Plaintiff and every Class Member, proximately causing them substantial damages.

## VIII. THIRD CAUSE OF ACTION
### Breach of the Implied Duty of Good Faith and Fair Dealing
#### (*By Plaintiff and the Class*)

69. Plaintiff repeat and re-allege paragraphs 1–59 above.

70. Plaintiff's and Class Members' commercial policies, issued by Aspen, are contracts.

**71.** Aspen incurred a duty of good faith and fair dealing when contracting with Plaintiff and Class Members.

**72.** By its conduct, as alleged above, Aspen has breached the duty of good faith and fair dealing it owes to Plaintiff and every Class Member, proximately causing them substantial damages.

73. Aspen engaged in conduct, in bad faith, which evaded the spirit of the contract, was unfaithful to the purpose of the contract, and injured the rights of Plaintiff and every Class member to receive the benefits of the contract.

74. Aspen's bad faith actions include, but are not limited to, its neglect or refusal to fulfill its duty and contractual obligation to Plaintiff and every Class Member that was not prompted by an honest mistake regarding its rights or duties, but by some interested or sinister motive, or dishonest purpose.

### IX. PRAYER FOR RELIEF

Plaintiff, both individually and on behalf of Class Members, request orders and/or judgments:

a. Certifying the proposed class, appointing Plaintiff to represent the class, and appointing the undersigned counsel as Class Counsel for the class.

b. Entering judgments awarding the declaratory relief sought identified in paragraph 62 above.

c. Entering injunctive orders of relief compelling Aspen to take the actions identified in paragraph 63 above.

d. Awarding Plaintiff and all Class Members full contract damages for Aspen's breaches of their insurance contracts in an amount to be determined at trial.

e.  Awarding Plaintiff and all Class Members pre-and post-judgment interest, to the extent allowable.

f.  Awarding Plaintiff and the Class's attorneys' fees and their costs and expenses of suit.

g.  Awarding all such other and further relief as may be just and appropriate.

## X. JURY DEMAND

Plaintiff demands a trial by jury on all claims triable to a jury.

Date: March 29, 2021                           Respectfully submitted,

                                  By: _/s/Todd Steigman_____
                                      Todd Steigman (ct26875)
                                      Madsen, Prestley & Parenteau, LLC
                                      402 Asylum Street
                                      Hartford, CT 06103
                                      Tel: (860) 246-2466
                                      Fax: (860) 246-1794
                                      Email: tsteigman@mppjustice.com

                                      /s/ Cyrus Mehri
                                      Cyrus Mehri, CT Bar No. 308999
                                      Jay Angoff, Pro Hac Vice Forthcoming
                                      Joshua Karsh, Pro Hac Vice
                                      Forthcoming
                                      C. Ezra Bronstein, Pro Hac Vice
                                      Forthcoming
                                      MEHRI & SKALET, PLLC
                                      1250 Connecticut Avenue, NW, Suite
                                      300 Washington, DC 20036
                                      Telephone: 202-822-5100
                                      Fax: (202) 822-4997
                                      Email: cmehri@findjustice.com
                                      Email: jangoff@findjustice.com
                                      Email: jkarsh@findjustice.com
                                      Email: ebronstein@findjustice.com

# EXHIBIT 1

# ISO Circular

**FORMS - FILED**                                                                                          JULY 6, 2006
**FROM**: LARRY PODOSHEN, SENIOR ANALYST

COMMERCIAL PROPERTY          LI-CF-2006-175

# NEW ENDORSEMENTS FILED TO ADDRESS EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This circular announces the submission of forms filings to address exclusion of loss due to disease-causing agents such as viruses and bacteria.

## BACKGROUND

Commercial Property policies currently contain a pollution exclusion that encompasses contamination (in fact, uses the term *contaminant* in addition to other terminology). Although the pollution exclusion addresses contamination broadly, viral and bacterial contamination are specific types that appear to warrant particular attention at this point in time.

## ISO ACTION

We have submitted forms filing CF-2006-OVBEF in all ISO jurisdictions and recommended the filing to the independent bureaus in other jurisdictions. This filing introduces new endorsement CP 01 40 07 06 - Exclusion Of Loss Due To Virus Or Bacteria, which states that there is **no coverage for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease**.

**Note:** In Alaska, District of Columbia, Louisiana*, New York and Puerto Rico, we have submitted a different version of this filing, containing new endorsement CP 01 75 07 06 in place of CP 01 40. The difference relates to lack of implementation of the mold exclusion that was implemented in other jurisdictions under a previous multistate filing.

Both versions of CF-2006-OVBEF are attached to this circular.

* In Louisiana, the filing was submitted as a recommendation to the Property Insurance Association of Louisiana (PIAL), the independent bureau with jurisdiction for submission of property filings.

## PROPOSED EFFECTIVE DATE

Filing CF-2006-OVBEF was submitted with a proposed effective date of January 1, 2007, in accordance with the applicable effective date rule of application in each state, with the exception of various states for which the insurer establishes its own effective date.

Upon approval, we will announce the actual effective date and state-specific rule of effective date application for each state.

## RATING SOFTWARE IMPACT

New attributes being introduced with this revision:

- A new form is being introduced.

## CAUTION

This filing has <u>not</u> yet been approved. If you print your own forms, do <u>not</u> go beyond the proof stage until we announce approval in a subsequent circular.

## RELATED RULES REVISION

We are announcing in a separate circular the filing of a corresponding rules revision. Please refer to the **Reference(s)** block for identification of that circular.

## REFERENCE(S)

<u>LI-CF-2006-176</u> (7/6/06) - New Additional Rule Filed To Address Exclusion Of Loss Due To Virus Or Bacteria

## ATTACHMENT(S)

- Multistate Forms Filing CF-2006-OVBEF
- State-specific version of Forms Filing CF-2006-OVBEF (Alaska, District of Columbia, Louisiana, New York, Puerto Rico)

We are sending these attachments only to recipients who asked to be put on the mailing list for attachments. If you need the attachments for this circular, contact your company's circular coordinator.

## PERSON(S) TO CONTACT

If you have any questions concerning:

- the content of this circular, please contact:

    Larry Podoshen
    Senior Analyst
    Commercial Property
    (201) 469-2597          Fax: (201) 748-1637
    comfal@iso.com
    lpodoshen@iso.com

                    or

    Loretta Newman, CPCU
    Manager
    Commercial Property
    (201) 469-2582          Fax: (201) 748-1873
    comfal@iso.com
    lnewman@iso.com

© ISO Properties, Inc., 2006

- the **mailing or distribution** of this circular, please contact our Customer Service Division:

  | | |
  |---|---|
  | E-mail: | info@iso.com |
  | Fax: | 201-748-1472 |
  | Phone: | 800-888-4476 |
  | World Wide Web: | http://www.iso.com |
  | Write: | See address on page 1 |

- products or services, please call or e-mail ISO Customer Service, or call your ISO representative.

Callers outside the United States may contact us using our global toll-free number (International Access Code + 800 48977489) or by e-mail at info.global@iso.com. For information on all ISO products, visit us at http://www.iso.com.



**IMPORTANT NOTICE FOR USERS OF
ISO PRODUCTS AND SERVICES**

Please make sure that your company has authorized your use of this product and has complied with the requirements applicable in the jurisdiction where you plan to use it.

We distribute both state-specific and multi-state products and services. We do not distribute all the multi-state products and services for use in every jurisdiction due to corporate policy, regulatory preference, or variations or lack of clarity in state laws.

We provide participating insurers with information concerning the jurisdictions for which our products and services are distributed. Even in those jurisdictions, each insurer must determine what filing requirements, if any, apply and whether those requirements have been satisfied.

Now, as in the past, all of our products and services are advisory, and are made available for optional use by participating insurers as a matter of individual choice. Your company must decide for itself which, if any, ISO products or services are needed or useful to its operation and how those selected for use should be applied. We urge that you be guided by the advice of your attorneys on the legal requirements.

**Copyright Explanation**

The material distributed by Insurance Services Office, Inc. is copyrighted. All rights reserved. Possession of these pages does not confer the right to print, reprint, publish, copy, sell, file, or use same in any manner without the written permission of the copyright owner. Permission is hereby granted to members, subscribers, and service purchasers to reprint, copy, or otherwise use the enclosed material for purposes of their own business use relating to that territory or line or kind of insurance, or subdivision thereof, for which they participate, provided that:

A. where ISO copyrighted material is reprinted, copied, or otherwise used **as a whole**, it must reflect the copyright notice actually shown on such material.

B. where ISO copyrighted material is reprinted, copied, or otherwise used **in part**, the following credit legend must appear at the bottom of each page so used:

Includes copyrighted material of Insurance Services Office, Inc., with its permission.

© ISO Properties, Inc., 2006

**Edition 11-03**

COMMERCIAL FIRE AND ALLIED LINES
FORMS FILING CF-2006-OVBEF

# Amendatory Endorsement - Exclusion Of Loss Due To Virus Or Bacteria

## About This Filing

This filing addresses exclusion of loss due to disease-causing agents such as viruses and bacteria.

### New Form

We are introducing:

♦ Endorsement **CP 01 40 07 06** - Exclusion Of Loss Due To Virus Or Bacteria

## Related Filing(s)

Rules Filing CF-2006- OVBER

## Introduction

The current pollution exclusion in property policies encompasses contamination (in fact, uses the term *contaminant* in addition to other terminology). Although the pollution exclusion addresses contamination broadly, viral and bacterial contamination are specific types that appear to warrant particular attention at this point in time.

An example of bacterial contamination of a product is the growth of listeria bacteria in milk. In this example, bacteria develop and multiply due in part to inherent qualities in the property itself. Some other examples of viral and bacterial contaminants are rotavirus, SARS, influenza (such as avian flu), legionella and anthrax. The universe of disease-causing organisms is always in evolution.

Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.

© ISO Properties, Inc., 2006

# Current Concerns

Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case. In addition, pollution exclusions are at times narrowly applied by certain courts. In recent years, ISO has filed exclusions to address specific exposures relating to contaminating or harmful substances. Examples are the mold exclusion in property and liability policies and the liability exclusion addressing silica dust. Such exclusions enable elaboration of the specific exposure and thereby can reduce the likelihood of claim disputes and litigation.

While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.

In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.

# Features Of New Amendatory Endorsement

The amendatory endorsement presented in this filing states that there is **no coverage for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.** The exclusion (which is set forth in Paragraph B of the endorsement) applies to property damage, time element and all other coverages; introductory Paragraph A prominently makes that point. Paragraphs C and D serve to avoid overlap with other exclusions, and Paragraph E emphasizes that other policy exclusions may still apply.

# Copyright Explanation

The material distributed by Insurance Services Office, Inc. is copyrighted. All rights reserved. Possession of these pages does not confer the right to print, reprint, publish, copy, sell, file or use same in any manner without the written permission of the copyright owner.

© ISO Properties, Inc., 2006

# Important Note

Insurance Services Office, Inc. (ISO) makes available advisory services to property/casualty insurers. ISO has no adherence requirements. ISO policy forms and explanatory materials are intended solely for the information and use of ISO's participating insurers and their representatives, and insurance regulators. Neither ISO's general explanations of policy intent nor opinions expressed by ISO's staff necessarily reflect every insurer's view or control any insurer's determination of coverage for a specific claim. ISO does not intercede in coverage disputes arising from insurance policies. If there is any conflict between a form and any other part of the attached material, the provisions of the form apply.

© ISO Properties, Inc., 2006

COMMERCIAL PROPERTY
CP 01 40 07 06

THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from "fungus", wet rot or dry rot. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The following provisions in this Coverage Part or Policy are hereby amended to remove reference to bacteria:

**1.** Exclusion of "Fungus", Wet Rot, Dry Rot And Bacteria; and

**2.** Additional Coverage - Limited Coverage for "Fungus", Wet Rot, Dry Rot And Bacteria, including any endorsement increasing the scope or amount of coverage.

**E.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

N

E

W

**ALASKA, DISTRICT OF COLUMBIA, LOUISIANA, NEW YORK, PUERTO RICO**
COMMERCIAL FIRE AND ALLIED LINES
FORMS FILING CF-2006-OVBEF

# Amendatory Endorsement - Exclusion Of Loss Due To Virus Or Bacteria

## About This Filing

This filing addresses exclusion of loss due to disease-causing agents such as viruses and bacteria.

### New Form

We are introducing:

♦ Endorsement **CP 01 75 07 06** - Exclusion Of Loss Due To Virus Or Bacteria

## Related Filing(s)

Rules Filing CF-2006-OVBER

## Introduction

The current pollution exclusion in property policies encompasses contamination (in fact, uses the term *contaminant* in addition to other terminology). Although the pollution exclusion addresses contamination broadly, viral and bacterial contamination are specific types that appear to warrant particular attention at this point in time.

An example of bacterial contamination of a product is the growth of listeria bacteria in milk. In this example, bacteria develop and multiply due in part to inherent qualities in the property itself. Some other examples of viral and bacterial contaminants are rotavirus, SARS, influenza (such as avian flu), legionella and anthrax. The universe of disease-causing organisms is always in evolution.

Disease-causing agents may render a product impure (change its quality or substance), or enable the spread of disease by their presence on interior building surfaces or the surfaces of personal property. When disease-causing viral or bacterial contamination occurs, potential claims involve the cost of replacement

© ISO Properties, Inc., 2006

of property (for example, the milk), cost of decontamination (for example, interior building surfaces), and business interruption (time element) losses.

# Current Concerns

Although building and personal property could arguably become contaminated (often temporarily) by such viruses and bacteria, the nature of the property itself would have a bearing on whether there is actual property damage. An allegation of property damage may be a point of disagreement in a particular case. In addition, pollution exclusions are at times narrowly applied by certain courts. In recent years, ISO has filed exclusions to address specific exposures relating to contaminating or harmful substances. Examples are the mold exclusion in property and liability policies and the liability exclusion addressing silica dust. Such exclusions enable elaboration of the specific exposure and thereby can reduce the likelihood of claim disputes and litigation.

While property policies have not been a source of recovery for losses involving contamination by disease-causing agents, the specter of pandemic or hitherto unorthodox transmission of infectious material raises the concern that insurers employing such policies may face claims in which there are efforts to expand coverage and to create sources of recovery for such losses, contrary to policy intent.

In light of these concerns, we are presenting an exclusion relating to contamination by disease-causing viruses or bacteria or other disease-causing microorganisms.

# Features Of New Amendatory Endorsement

The amendatory endorsement presented in this filing states that there is **no coverage for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease**. The exclusion (which is set forth in Paragraph B of the endorsement) applies to property damage, time element and all other coverages; introductory Paragraph A prominently makes that point. Paragraph C serves to avoid overlap with another exclusion, and Paragraph D emphasizes that other policy exclusions may still apply.

# Copyright Explanation

The material distributed by Insurance Services Office, Inc. is copyrighted. All rights reserved. Possession of these pages does not confer the right to print, reprint, publish, copy, sell, file or use same in any manner without the written permission of the copyright owner.

© ISO Properties, Inc., 2006

# Important Note

Insurance Services Office, Inc. (ISO) makes available advisory services to property/casualty insurers. ISO has no adherence requirements. ISO policy forms and explanatory materials are intended solely for the information and use of ISO's participating insurers and their representatives, and insurance regulators. Neither ISO's general explanations of policy intent nor opinions expressed by ISO's staff necessarily reflect every insurer's view or control any insurer's determination of coverage for a specific claim. ISO does not intercede in coverage disputes arising from insurance policies. If there is any conflict between a form and any other part of the attached material, the provisions of the form apply.

© ISO Properties, Inc., 2006

COMMERCIAL PROPERTY
CP 01 75 07 06

## THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.

# EXCLUSION OF LOSS DUE TO VIRUS OR BACTERIA

This endorsement modifies insurance provided under the following:

COMMERCIAL PROPERTY COVERAGE PART
STANDARD PROPERTY POLICY

**A.** The exclusion set forth in Paragraph **B.** applies to all coverage under all forms and endorsements that comprise this Coverage Part or Policy, including but not limited to forms or endorsements that cover property damage to buildings or personal property and forms or endorsements that cover business income, extra expense or action of civil authority.

**B.** We will not pay for loss or damage caused by or resulting from any virus, bacterium or other microorganism that induces or is capable of inducing physical distress, illness or disease.

However, this exclusion does not apply to loss or damage caused by or resulting from fungus. Such loss or damage is addressed in a separate exclusion in this Coverage Part or Policy.

**C.** With respect to any loss or damage subject to the exclusion in Paragraph **B.**, such exclusion supersedes any exclusion relating to "pollutants".

**D.** The terms of the exclusion in Paragraph **B.**, or the inapplicability of this exclusion to a particular loss, do not serve to create coverage for any loss that would otherwise be excluded under this Coverage Part or Policy.

N

E

W

© ISO Properties, Inc.,  2006

# EXHIBIT 2

    

April 2, 2020

The Honorable Gilbert Cisneros
431 Cannon House Office Building
Washington, DC 20515

The Honorable Mike Thompson
406 Cannon Office Building
Washington, DC 20515

Dear Representatives Cisneros and Thompson:

COVID-19 has caused waves of disruption and introduced tremendous amounts of uncertainty in the global economy, causing hardships for many businesses and workers in California. Many of our members are small businesses that have also been deeply affected by government closures and restrictions, labor force limitations, supply chain interruptions, and the curtailment of ordinary activities. We share your commitment to identifying and implementing solutions to the ongoing economic challenges caused by COVID-19 and to providing immediate economic support to those in need.

Members of the undersigned organizations have received inquiries about the ability of the insurance industry to compensate businesses for economic losses stemming from this global health emergency and about the nature and applicability of business interruption insurance. Standard commercial insurance policies offer coverage and protection against a wide range of risks and threats and are vetted and approved by state regulators. Insurance coverage works by spreading risk, but that model simply cannot account for a situation in which losses are catastrophic and nearly universal. Standard business interruption policies do not, and were not designed to, provide coverage against communicable diseases such as COVID-19, and as such, were not actuarially priced to do so.

It is worth noting that recent estimates show that business continuity losses just for small businesses of 100 employees or fewer could amount to between $220 billion to $383 billion per month. Meanwhile, the total surplus for all of the U.S. home, auto, and business insurers combined to pay all future losses is only $800 billion. The insurance industry must protect our solvency to pay on promises we have made to policyholders.
The U.S. insurance industry remains committed to our consumers and will ensure that prompt payments are made in instances where coverage exists. We also embrace our role as members of our respective communities. It is in this role that our members have begun to work with our customers on issues such as flexibility in the premium payments.

The U.S is in the midst of a national crisis that will require a national response, including federal assistance that swiftly provides funding directly to those American individuals and businesses most in need. Our organizations stand ready to work with Congress on solutions that provide the necessary relief as soon as possible. The loan programs instituted by the CARES Act provide a down payment on economic support for Main Street businesses, but additional liquidity will be required for impaired industries and businesses to avoid an unprecedented systemic, economic crisis.

To that end, we joined more than 30 groups representing commercial policyholders in a letter to President Trump and leaders of Congress urging the creation of the COVID-19 Business and Employee Continuity and Recovery Fund ("Recovery Fund"). The Recovery Fund would be backed by the federal government and under the authority of a special federal administrator with the ability to enter into contracts with interested businesses to administer the Recovery Fund and facilitate the distribution of federal funds and liquidity to impacted businesses and their employees.

We understand the extraordinary challenges our country is facing -- our member businesses, our employees, and our families are confronting the same trials. Our organizations stand ready to work with Congress on solutions that provide the necessary relief as soon as possible.

Thank you very much for your leadership in these difficult times.

Sincerely,

Mr. Jimi Grande, Senior Vice President, Government Affairs, National Association of Mutual Insurance Companies
Mr. Charles E. Symington, Jr., Senior Vice President of External, Industry & Government Affairs, Independent Insurance Agents & Brokers of America
Mr. Nathaniel F. Wienecke, Senior Vice President, Federal Government Relations, American Property Casualty Insurance Association
Ms. Nicole C. Austin, Senior Vice President and Director of Federal Affairs, Reinsurance Association of America
Mr. Joel Wood, Senior Vice President, Government Affairs, The Council of Insurance Agents & Brokers

Cc:

The Honorable Ken Calvert
The Honorable Anna Eshoo
The Honorable Zoe Lofgren
The Honorable Barbara Lee
The Honorable Grace F. Napolitano
The Honorable Adam B. Schiff
The Honorable Jim Costa
The Honorable Doris Matsui
The Honorable Jerry McNerney
The Honorable Jackie Speier
The Honorable Tom McClintock
The Honorable Judy Chu
The Honorable Ami Bera
The Honorable Julia Brownley
The Honorable Tony Cardenas
The Honorable Jared Huffman
The Honorable Doug LaMalfa
The Honorable Alan Lowenthal
The Honorable Raul Ruiz, M.D.
The Honorable Eric Swalwell
The Honorable Ted W. Lieu
The Honorable Norma J. Torres
The Honorable J. Luis Correa
The Honorable Ro Khanna
The Honorable Jimmy Panetta
The Honorable Jimmy Gomez
The Honorable TJ Cox
The Honorable Josh Harder
The Honorable Mike Levin
The Honorable Katie Porter
The Honorable Nanette Diaz Barragan

# EXHIBIT 3

| | |
|---|---|
| **From:** | Jay Angoff |
| **To:** | Dominic Charles; Ezra Bronstein |
| **Subject:** | Fw: Timothy Elder, DDS |
| **Date:** | Wednesday, December 23, 2020 10:43:57 AM |
| **Attachments:** | image001.png |
| | image828610.png |
| | Timothy Elder responses to ACM questionnaire on behalf of Aspen American Ins. Co., Nov. 16, 2020.docx |

---

**From:** Jay Angoff <jay.angoff@findjustice.com>
**Sent:** Monday, November 16, 2020 9:57 AM
**To:** Bill Milliard <bmilliard@acmclaims.com>
**Subject:** Re: Timothy Elder, DDS

Mr. Milliard, please see the attached responses of my client, Aspen American Insurance Company insured Timothy E. Elder DDS, Policy Number D016948-08, to the questionnaire attached to your below email of October 21, 2020.

I look forward to hearing from you at your earliest convenience.

Thank you.

**Jay Angoff** | Mehri & Skalet, PLLC | 1250 Connecticut Ave. NW Suite 300 | Washington, DC 20036 | Office 202.822.5100 | Fax 202.822.4997
| www.findjustice.com | jay.angoff@findjustice.com

---

**From:** Bill Milliard <bmilliard@acmclaims.com>
**Sent:** Wednesday, October 21, 2020 11:03 AM
**To:** Jay Angoff <jay.angoff@findjustice.com>
**Subject:** FW: Timothy Elder, DDS

Mr. Angoff,

We apologize for not getting back with you sooner.

Please have your client complete the attached questionnaire and return it to me. We will review the responses in the questionnaire and get back with you.

Regards,

Bill



**BILL MILLIARD**
**COMMERCIAL CLAIMS ADJUSTER**

**American Claims Management**
**Innovative Solutions. Exceptional Results.**
PO Box 9060, Carlsbad, CA 92018

T: 913-348-2372
TF:866-671-5042

bmilliard@acmclaims.com | ACMClaims.com

---

**From:** Bill Milliard <bmilliard@acmclaims.com>
**Sent:** Thursday, August 20, 2020 2:36 PM
**To:** Jay Angoff <jay.angoff@findjustice.com>
**Subject:** RE: Timothy Elder, DDS

Mr. Angoff,

We received your letter of representation and presentation of claim. We will respond shortly with what we need to assist us in investigating the claim.

Regards,

Bill



**BILL MILLIARD**
**COMMERCIAL CLAIMS ADJUSTER**

**American Claims Management**
**Innovative Solutions. Exceptional Results.**
PO Box 9060, Carlsbad, CA 92018

T: 913-348-2372
TF:866-671-5042

bmilliard@acmclaims.com | ACMClaims.com

If you do not want to receive future communications about our products and services, you may 'opt out' by replying to this E-mail with the word 'REMOVE' in the subject line. This E-Mail may contain proprietary, confidential or privileged information intended solely for the addressee. If you are not the intended recipient, any use, copying disclosure, dissemination or distribution is strictly prohibited. If you

received this message in error, please notify the sender immediately by return E-Mail, delete this communication and destroy all copies.

**From:** Jay Angoff <jay.angoff@findjustice.com>
**Sent:** Thursday, August 20, 2020 2:21 PM
**To:** Bill Milliard <bmilliard@acmclaims.com>
**Subject:** Timothy Elder, DDS

[External]
**Attn Mr. Bill Milliard**
**National Administrator B&B Protector Plans, Inc.**
**Coverage Provided by Aspen American Insurance Company**

Dear Mr. Millar:

I represent Timothy E. Elder DDS, your insured under Policy Number D016948-08. I am hereby filing a claim on behalf of Dr. Elder for Practice Income, Extra Expense, and Extended Practice Income under that policy, as well as for any other coverage that may apply under the policy. Dr. Elder's practice was shut down on March 17, 2020; it was re-opened on June 8, 2020.

Based on the physical damage to his property caused by the coronavirus (Covid-19), and also based on the multiple governmental orders that as a practical matter have prohibited access to Dr. Elder's office due to coronavirus-caused physical damage to both his and others' property, the policy provides coverage for Dr. Elder's loss of practice income. In addition, the policy does not appear to set forth any unambiguous exclusion that would exclude coverage for Dr. Elder's lost income.

As you know, Dr. Elder has been insured continuously through Brown & Brown and Aspen American Insurance Company for many years and until now has never filed a claim of any kind.

I am happy to submit whatever records Brown & Brown or Aspen American Insurance Company might need in order to adjust Dr. Elder's claim.

Sincerely,


**Jay Angoff** | Mehri & Skalet, PLLC | 1250 Connecticut Ave. NW Suite 300 | Washington, DC  20036 | Office 202.822.5100 | Fax 202.822.4997
| www.findjustice.com | jay.angoff@findjustice.com

**American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

Please answer the following questions for each property you are including in your claim.

1.      Business Name:_____

2.      Loss Location:_____

3.      Please specify whether you are claiming direct physical loss of or damage to real property, personal
property, stock and supplies, and/or merchandise. _____
_____

4.      If you are claiming direct physical loss of or damage to insured property, please explain the nature of
that physical loss or damage. _____
_____

5.      Has there been a confirmed case of COVID-19 at the insured property?_____
_____

       a.   If so, please identify the status of the individual(s) who had COVID-19 while at the identified property
(employee, customer, etc.), identify when these individual(s) were at the property and advise
whether a COVID-19 diagnosis has been confirmed for the individual(s) described._____
_____
_____

6.      Has the insured property been tested for the presence of COVID-19?_____
_____

       a.   If so, please provide all relevant details including, but not limited to, when the property was tested,
which organization tested the property, and any reports prepared by that organization confirming
the conclusions of their investigation/testing._____
_____

7.      Is your business fully closed?_____

       a.   If so, on what date did it fully close?_____
_____

TOL 877.895.1297
FAX 619.744.5094
CA License #2C37446

**American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

8.    Has your business reduced its hours of operation? _____

_____

    a.  If so, please explain the nature of this partial operation including, but not limited to, whether your business is operating with reduced staff, whether your operation is open for pickup and/or deliveries?_____

_____

    b.  If so, please advise when the reduction in operation began? _____

_____

9.    Please advise what is required to resume full operation of your business?_____

_____

10.   Please advise what is required to resume partial operations?_____

_____

11.   What is your total estimated loss?_____

_____

    a.  Please separately allocate the amount of your claimed physical damage and business interruption._____

_____

12.   Has ingress or egress to your business been physically prevented, either partially or totally, and if so, provide an explanation as to how and why?

_____

13.   Is there a state or city order impacting your business operations? _____

_____

    a.  If so, please provide a copy of the order.

14.   Have any suppliers or customers been prevented from providing or receiving goods, services or information    as    a    result    of    COVID-19?    _____

_____

TOL 877.895.1297
FAX 619.744.5094
CA License #2C37446

ACMClaims.com



**American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

a. If so, please identify the supplier and/or customer, explain how that supplier or customer's property was damaged, and explain how that damage prevented:

    i. Your supplier from providing you goods or services, or

    ii. Your customer from accepting your goods or services. _____

_____

_____

15. Please provide any additional information relevant to your claim. _____

_____

<u>November 16, 2020</u>

<u>Responses of Timothy E. Elder DDS, Policy Number D016948-08, to American Claims
Management Questionnaire on Behalf of Aspen American Insurance Company</u>

1. Business Name

   **Timothy E. Elder DDS**

2. Loss Location

   **1712 I Street, NW
   Washington, DC   20006**

3. Please specify whether you are claiming direct physical loss of or damage to real property, personal property, stock and supplies, and/or merchandise.

   **I am claiming direct physical loss of property, which includes the inability to utilize or possess something in the real, material, or bodily world.  Direct physical loss describes the scenario where businessowners and their employees, customers, vendors, suppliers, and others lose the full range of rights and advantages of using or accessing their business property.**

4. If you are claiming direct physical loss of or damage to insured property, please explain the nature of that physical loss or damage.

   **Please see answer to Question 3.**

5. Has there been a confirmed case of COVID-19 at the insured property?

   **I don't know whether there has been or not.  I do not believe that the existence of such a case determines whether there has been physical loss of or damage to the insured property.**

6. Has the insured property been tested for the presence of COVID-19?

   **No.**

1

7. Is your business fully closed?

**It is not now.  It was fully closed between March 17, 2020 and May 18, 2020.**

8. Has your business reduced its hours of operation?

**Yes.  From May 18 until June 8 I was the only producer in the office.  I brought back one hygienist on June 8 and that schedule has continued until the present.**

9. Please advise what is required to resume full operation of your business.

**Not applicable.**

10. Please advise what is required to resume partial operations?

**Not applicable.**

11. What is your total estimated loss?

**$237,352.**

a.  Please separately allocate the amount of your claimed physical damage and business interruption

**This question assumes a conclusion which is a matter of dispute, and accordingly is objectionable.**

12. Has ingress or egress to your business been physically prevented, either partially or totally, and if so, provide an explanation as to how and why?

**Yes, ingress and egress has been prevented as a consequence of District of Columbia Mayor Muriel Bowser's orders regarding the coronavirus, beginning on or about March 17. 2020.**

13. Is there a state or city order impacting your business operations?

**Yes.**

a.  If so, please provide a copy of the order.

2

**Copies of all such orders are available here:**

**https://coronavirus.dc.gov/page/stay-home**

14.  Have any suppliers or customers been prevented from providing or receiving goods, services or information as a result of COVID-19?

      **Yes.**

      a.  If so, please identify the supplier and/or customer, explain how that supplier or customer's property was damaged, and explain how that damage prevented:

            i.  Your supplier from providing you goods or services, or

            ii.  Your customer from accepting your goods or services.

      **All suppliers and customers have been unable to access my office  as a consequence of COVID-19 and/or Orders issued by the Mayor in connection therewith.**

# EXHIBIT 4

**American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.



## CERTIFIED PROOF OF MAILING

Mehri & Skalet, PLLC                                                           12/9/2020
Attn: Jay Angoff
1250 Connecticut Ave. NW Suite 300
Washington, DC 20036

## RE: DECLINATION OF COVERAGE – PLEASE READ CAREFULLY

Insured       : Timothy E. Elder DDS
Claim No.     : 210001242
Policy No.    : D016948-07
Date of Loss  : 03/17/2020

Dear Mr. Angoff:

American Claims Management, Inc. (ACM) is the third-party administrator for Aspen American Insurance Company (Aspen) regarding the above-mentioned claim. Aspen has completed its investigation of the above-referenced claim and reviewed all applicable policy provisions. Our comprehensive review is below.

Please note that no representative of ACM has any authority either to bind Aspen with respect to coverage, or to interpret, waive or alter any of the terms, conditions, or limitations of the policy. All coverage determinations are reserved exclusively to Aspen.

**Facts of Loss**

This letter confirms receipt of the loss notice by ACM on August 18, 2020, indicating a loss for business interruption due to Covid-19 as a result of the insured's dental practice being closed by State Government orders. Per the questionnaire form completed by you, we understand that the insured's employees, customers, vendors, suppliers, and others could not use or access the business property during the period of business closure between March 17, 2020 and May 18, 2020. There is no physical damage to the location.

Your policy lists the following location:

1712 Eye St., NW, #306
Washington, DC 20006

TOL 800.453.8610
FAX 760.827.4995
CA License #2C37446

ACMClaims.com



American Claims Management
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

**Pertinent Policy Provisions**

Aspen issued policy number D016948-07 to Timothy E. Elder DDS effective for the policy period of 08/01/2019 to 08/01/2020 (the "Policy"). We refer you to your Policy form ASPDTPR001, which states, in part:

### BUILDING, BLANKET DENTAL PRACTICE PERSONAL PROPERTY AND INCOME COVERAGE PART

**A. Covered Property**

We will pay for all direct physical **damage** to covered property at the premises described on the Declarations caused by or resulting from any **covered cause of loss**.
. . .

    **1. Building;**

    **2. Your blanket dental practice personal property:**

       ...

    **3. Practice Income**

      **a. Blanket dental practice personal property**

         We will pay for the actual loss of **practice income you** sustain, or the Valued Daily Limit, as described under Limits of Insurance provision III.E.6., due to the necessary suspension of **your** practice during the **period of restoration**. The suspension must be caused by direct physical **damage** to the **building** or **blanket dental practice personal property** at the described premises caused by or resulting from a **covered cause of loss** or power failure as described under Paragraph **I.B.8.**

    **4. Extra Expense**

         Extra expense means the extra expenses necessarily incurred by **you** during the **period of restoration** to continue normal services and operations which are interrupted due to **damage** by a **covered cause of loss** to the premises described, or power failure as described under Paragraph **I.B.8. You** will exercise due diligence and dispatch to restore normal practice services.

         We will only pay for extra expenses that **you** incur within 12 consecutive months after the date of direct physical **damage** or power failure as described under Paragraph **I.B.8.**

**B. Covered Related Expenses**

TOL 800.453.8610
FAX 760.827.4995
CA License #2C37446

ACMClaims.com



**American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

We will also pay for the following expenses:

. . .

13. As respects practice income:

. . .

> **b.** Civil Authority
>
> We will pay for the actual loss of **practice income** and **rents you** sustain caused by action of civil authority that prohibits access to the described premises due to the direct physical **damage** to property, other than at the described premises, caused by or resulting from any **covered cause of loss.** . . .

. . .

## II. EXCLUSIONS

A. We will not pay for **damage** caused directly or indirectly by any of the following. Such **damage** is excluded regardless of any other cause or event that contributes concurrently in any sequence to the **damage**.

1. Ordinance or Law

The enforcement of any ordinance or law:

a. regulating the construction, use or repair of any property;

. . .

B. We will not pay for damage caused by or resulting from any of the following:

. . .

2. delay, loss of use or loss of market;

. . .

## IV. DEFINITIONS

. . .

**"Covered Causes of Loss"** means ALL RISK OF DIRECT PHYSICAL LOSS except as excluded or limited in Section II. of this Coverage Part.
. . .

**"Damage"** means partial or total loss of or damage to **your** covered property.

**"Period of Restoration"** means the period of time that:

TOL 800.453.8610
FAX 760.827.4995
CA License #2C37446

 **American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

A. begins 24 hours immediately following direct physical **damage** or power failure as described under Paragraph **I.B.8.** caused by or resulting from any **covered cause of loss** at the described premises or power failure as described in Paragraph **I.B.8.**; and

B. ends on the date when the property at the described premises should be repaired, rebuilt or replaced with reasonable speed and similar quality.

In addition, please refer to Endorsement ASPDTPR021, which reads, in part, as follows:

This endorsement modifies insurance provided under the following:

**BUILDING, BLANKET DENTAL PRACTICE PERSONAL PROPERTY AND INCOME COVERAGE PART**

In consideration of the premium charged, the Policy is modified as follows:

1. Section **II. EXCLUSIONS**, Paragraph **A.** is amended with the addition of the following exclusions:

   **8. Fungus, Wet Rot, Dry Rot and Microbes**

   Presence, growth, proliferation, spread or any activity of **fungus**, wet rot, dry rot, or **microbes**.

   But if **fungus**, wet rot, dry rot, or **microbes** results in a **specified cause of loss**, we will pay for that part of the **loss** or **damage** caused by that **specified cause of loss**.

   This exclusion does not apply:

   1. When **fungus**, wet rot, dry rot, or **microbes** results from fire or lightning; or
   2. To the extent that coverage is provided in the **Additional Coverage – Limited Coverage for Fungus, Wet Rot, Dry Rot and Microbes** Section of this Endorsement.

   **9. Ordinance or Law Regarding Fungus, Wet Rot, Dry Rot and Microbes**

   The enforcement of any ordinance or law which requires the demolition, repair, replacement, reconstruction, remodeling or remediation of property due to the presence, growth, proliferation, spread or any activity of **fungus**, wet rot, dry rot, or **microbes**.

   We will not pay the expenses associated with the enforcement of any ordinance or law which requires **you** or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of **fungus**, wet rot, dry rot, or **microbes**.
   . . .

2. The following is added to Section **I. COVERAGE AGREEMENTS**:

**E. Additional Coverage – Limited Coverage for Fungus, Wet Rot, Dry Rot and Microbes**

1. The coverage described in paragraphs **E2.** and **E5.** of this Limited Coverage only applies when the **fungus**, wet rot, dry rot, or **microbes** is the result of a **specified cause of loss** other than fire or lightning that occurs during the policy period and only if all reasonable means were used to save and preserve the property from further **damage** at the time of and after that occurrence.

2. We will pay for **loss** or **damage** by **fungus**, wet rot, dry rot, or **microbes**. As used in this Limited Coverage, the term **loss** or **damage** means:

**American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

---

a. Direct physical **loss** or **damage** to covered property caused by **fungus**, wet rot, dry rot, or **microbes**, including the cost of removal of the **fungus**, wet rot, dry rot, or **microbes**;

b. The cost to tear out and replace any part of the **building** or other property as needed to gain access to the **fungus**, wet rot, dry rot, or **microbes**; and

c. The cost of testing performed after removal, repair, replacement or restoration of the damaged property is completed, provided there is a reason to believe that **fungus**, wet rot, dry rot, or **microbes** are present.

...

5. The following paragraphs apply to the **practice income** and extra expense coverage and only if the necessary suspension of **your** practice during the **period of restoration** satisfies all terms and conditions of the applicable **practice income** and extra expense coverage. The coverage provided under this Limited Coverage is part of and does not increase the applicable limit of insurance on the **practice income** and extra expense coverage.

a. If the **loss** which resulted in **fungus**, wet rot, dry rot, or **microbes** does not in itself necessitate a suspension of **your** practice, but such suspension is necessary due to **loss** or **damage** to property caused by **fungus**, wet rot, dry rot, or **microbes**, then our payment of **practice income** and/or extra expense is limited to the amount of loss and/or expense sustained in a period of not more than 30 days. The days need not be consecutive.

b. If a covered suspension of **your** practice was caused by **loss** or **damage** other than **fungus**, wet rot, dry rot, or **microbes** but remediation of **fungus**, wet rot, dry rot, or **microbes** prolongs the **period of restoration**, we will pay for **loss** and/or expense sustained during the delay (regardless of when such a delay occurs during the **period of restoration**), but such coverage is limited to 30 days. The days need not be consecutive.

4. **Section IV. DEFINITIONS**, is amended to add the following definitions:

...

**"Microbes"** means any non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease. **Microbes** includes any spores, mycotoxins, odors, or any other substances, products, or byproducts produced by, released by, or arising out of the current or past presence of **microbes**.

The term **"Specified Causes of Loss"** is defined in form ASPDTPR001 as the following: fire; lightning; explosion; windstorm or hail; smoke; aircraft or vehicles; riot or civil commotion; vandalism; leakage from fire extinguishing equipment; **sinkhole collapse**; **volcanic action**; **falling objects**; weight of snow, ice or sleet; **water damage**.

## Coverage Analysis

The above policy provisions indicate that Practice Income coverage applies due to the necessary suspension of your practice when the suspension is caused by "direct physical damage" caused by or resulting from a covered cause of loss. In addition, the Extra Expense coverage requires direct physical damage or power failure.

TOL 800.453.8610
FAX 760.827.4995
CA License #2C37446

ACMClaims.com



American Claims Management
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

Practice Income arising out of action by a civil authority must also be the result of direct physical damage to property from a covered cause of loss.

Our investigation indicates that neither your building nor practice personal property sustained direct physical damage. Instead, the inability to continue your practice, in whole or part, is due to a directive or guideline from the above-referenced sources. Even if there were direct physical damage, the claim would not be covered because the Policy specifically excludes damage caused by the enforcement of any ordinance or law regulating the use of the property, loss of use or loss of market, and "microbes," which includes any "non-fungal micro-organism or non-fungal, colony-form organism that causes infection or disease." To the extent Coronavirus is a microbe, the **Additional Coverage – Limited Coverage for Fungus, Wet Rot, Dry Rot and Microbes** does not apply to this claim because Coronavirus did not result from any of the Specified Causes of Loss.

## Conclusion

In summary, Aspen is unable to find potential for coverage for any loss, damage, cost or expense arising from the claim as presented.

Aspen reserves all its rights under the Policy, at law and in equity. That reservation includes, without limitation, the right to raise new issues as and after they become known or otherwise amend this position as warranted by new information.

By specifically referring to Policy provisions, Aspen does not waive its right to assert any additional Policy terms or defenses. Nothing in this letter is intended as or should be construed as a waiver of any of Aspen's rights.

Please also be aware that under the terms of the Policy, there is a Legal Action provision. Please refer to your Policy which reads in part:

### V. CONDITIONS

The following Conditions apply in addition to the Common Policy Conditions.

. . .

**Legal Action Against Us**

The following is added to the Common Policy Conditions:

No one may bring a legal action against us under this Coverage Part unless the action is brought within:

6 Years in South Dakota;
5 Years in Florida or Kansas;
4 Years in Wyoming;
3 Years in Maryland, North Carolina, North Dakota or Utah; or
2 Years in all other States;

after the date on which the direct physical **damage** happened.



**American Claims Management**
P.O. Box 9030
Carlsbad, CA 92011

Innovative Solutions.
Exceptional Results.

We would like to thank you for your cooperation and assistance during this investigation. If you have any questions regarding this letter or if you would like to submit any additional information or documentation that you feel we should consider, please let me know as soon as possible.


Sincerely,


**Morey Howell**



Morey Howell, AIC, AINS
Adjuster II
American Claims Management, Inc.
TEL 407-499-0063 | TOLL FREE 800-453-8610
mohowell@acmclaims.com


cc:
R.K. Tongue Co., Inc.
575 S Charles St, Suite 205
Baltimore, MD 21201


TOL 800.453.8610
FAX 760.827.4995
CA License #2C37446

ACMClaims.com